193 So. 715

HAMILL et al. v. MOORE.

No. 34777.

May 29, 1939.

On Rehearing Nov. 27, 1939.

Second Rehearing Denied Feb. 5, 1940.

Edward F. LeBlanc and John Nugier, both of Abbeville, and Hugh M. Wilkinson and George M. Leppert, both of New Orleans, for plaintiffs and appellants.

Maurice T. Mouton, of Abbeville, Welton P. Mouton, of Lafayette, Worsham, Burrow & Worsham, of Dallas, Tex., and Spencer, Phelps, Dunbar & Marks, of New Orleans, for defendant and appellee.

LAND, Justice.

Plaintiffs are residents of the City of Houston, and defendant is a resident of the City of Dallas, State of Texas.

On January 28, 1936, plaintiffs filed suit in the District Court for the Parish of Vermilion to enforce specific performance of the following agreement:

"June 6, 1934."
"Mr. Claude B. Hamill,
"Mr. R. E. Smith,
"Houston, Texas,
"Gentlemen:

"I hereby agree that when I have finished the well that I am about to drill in the Abbeville Block of approximately 7,300 acres, if the well is a producer, I will assign to you three-fourths of all the minerals that I now hold in my name; or, if the well is a dry hole, I will assign to you all the minerals that I now hold in my

name. You have this day assigned to me approximately 7,300 acres of the 15,000 acres under lease in your name in this area. It is understood *that you will continue to carry me and my associates for a one-fourth interest in the remaining leases in this block.*" (Italics by Court.)

"Signed: J. C. Moore
"Accepted:
"Claude B. Hamill
"R. E. Smith."

The trial judge held "that plaintiffs had suffered the leases to 'terminate', and performance on the part of the plaintiffs of their engagements under the contract had become impossible.

"Such being the situation here presented, plaintiffs are not entitled to a decree of specific performance and their demands and claims herein must be rejected at their costs."

From a judgment rejecting the demands of plaintiffs at their costs, plaintiffs have appealed.

On or about July 1st, 1933, defendant, J. C. Moore, under an agreement with plaintiffs, came to Abbeville, in the Parish of Vermilion, for the purpose of securing from certain land owners in that parish certain oil and mineral leases, to be known as the "Abbeville Block", with the understanding that the leases were to be secured and placed in the name of Moore, to be thereafter assigned by him to plaintiffs.

All expenses in connection with the undertaking were to be borne by plaintiffs, and Moore was to have one-fourth (¼) share and interest in the leases.

In pursuance of the agreement, Moore leased a certain block of land in Vermilion Parish, known as the "Abbeville Block", consisting of approximately 15,000 acres. These leases were thereafter assigned to plaintiffs on November 25, 1933, and duly recorded in the conveyance records of Vermilion Parish on January 20, 1934.

In addition to these leases, it was further agreed that Moore was to acquire in his name for plaintiffs certain mineral interests and rights, to be evidenced by mineral deeds, in the "Abbeville Block", for such consideration as he might be compelled to pay, and to pay therefor by drafts upon plaintiffs.

In keeping with this agreement, Moore acquired in his name an undivided one-half (½) interest in and to all oil, gas and other minerals, in and under 3,500 acres in the "Abbeville Block".

These lands were secured by Moore under deed from various land owners in Vermilion Parish, and are described in paragraph 3 of plaintiffs' petition.

In the very beginning of plaintiffs' petition, it is alleged in paragraph 2, "that the said J. C. Moore was to have a one-fourth (¼) share and interest therein," referring to the leases secured by Moore for plaintiffs in his name, and paid for by plaintiffs.

It is apparent that Moore was to receive this undivided one-fourth (¼) interest in these leases for his services in securing them for plaintiffs, and that this was an undivided one-fourth (¼) interest acquired by Moore, *before the drilling of the well by him,* and the abandonment of same as a *dry hole.* This undivided one-fourth (¼) interest extended to all the leases acquired for plaintiffs in Moore's name in the entire 15,000 acre block.

In the agreement which plaintiffs seek to have specifically performed, relating to the drilling of the well by Moore, is the following clause:

"You have this day assigned to me approximately 7,300 acres of the 15,000 acres *under lease* in your name in this area. It is understood *that you will continue to carry me and my associates for a one-fourth interest in the remaining leases in this block*", i. e. for the remaining leases in 7,700 acres. (Italics by Court.)

At the time this drilling contract was made between plaintiffs and Moore, the defendant was entitled to, and already had, an undivided one-fourth (¼) interest in all the leases, as specifically admitted in the allegations of plaintiffs' petition.

The agreement is not that plaintiffs *would give* to Moore and his associates an undivided one-fourth interest in the remaining leases on 7,700 acres, *"if the well is a producer"*, but it was to *"continue to carry"* Moore and his associates for a one-fourth interest, which Moore already had in the remaining leases, and which plaintiffs, manifestly, had been "carrying", prior to the contract to be specifically enforced. If not so, why the agreement to "continue to carry"?

Moore did not purchase these leases from plaintiffs, and owed plaintiffs not one cent, as far as the acquisition of his interest in the leases was concerned. The only way

that plaintiffs could *"continue to carry"* Moore and his associates was by paying the yearly rentals on these leases.

In referring to these leases, the trial judge says in his opinion:

"These leases are all dated the 6th of November, 1933, are identical in terms, and recited that they should remain in force for a term of ten years from their date and as long thereafter as either oil or gas is or can be produced from any well on said land. It was also stipulated in said leases that if drilling operations are not commenced on said land on or before one year from date 'this lease shall be terminated as to both parties, unless lessee shall pay Lessor the sum of $——— hereinafter termed rental.'

"The yearly rentals stipulated were never paid, and as a result, the leases were 'terminated' long before the institution of this suit."

On the trial of the case, Mr. Smith, one of the plaintiffs, was asked to explain what was meant by the clause in the contract: "It is understood that you will continue to carry me and my associates for a one-fourth interest in the remaining leases in the block." The witness answered: "That was put in there for the purpose of assuring Mr. Moore *that they would have the same proportionate interest in the leases* that we retained in our name; *that we would carry them for that interest* just so long as the title remained in our hands. It was agreed that there would be no rentals paid in the event of the failure of the well that Mr. Moore was to drill." (Italics by Court.)

This testimony was objected to by defendant's counsel, and the objection was referred to the merits.

The testimony of Mr. Smith, one of the plaintiffs, is an explanation that fails to explain. Defendant and his associates were to be carried for one-fourth interest between them, and not for one-fourth interest each, while plaintiffs Hamill and Smith, under the agreement, were to retain three-fourths interests in the remaining leases.

Besides, on March 8, 1935, several months after the leases had terminated, Mr. Smith wrote defendant, Moore, a letter containing the following admissions and statements:

"After talking to you in Dallas, it is necessary, as I explained to you there, to show on our income tax return the money spent in Vermilion Parish in its entirety. Am enclosing instruments" (these were assignments to be signed by defendant of all the minerals held in his name referred to in the contract declared on) "which I spoke to you about and am asking you to sign them and return them to this office. You mention to your attorney *that you have a letter showing our agreement which will protect you under the terms set forth, as that is the status we have been existing under for some time."* (Italics by the Court.)

The letter referred to is the contract which plaintiffs seek to have specifically enforced in this case.

Further quoting from the same letter, Mr. Smith had this to say:

"You mentioned that you wanted the block of leases kept intact for purposes of

'drilling a well. The changing of the title of royalty cannot in any way affect this, *as I am telling you that we will do every thing that we said we would just as we have done in the past and will continue to do.*" (Italics by Court.)

We agree with the trial judge in his finding that the above quotations from the letter of April 8th, 1935, written several months after the leases had lapsed, as a result of the non-payment of the rentals, is a clear and unequivocal recognition on the part of Mr. Smith of his obligation to carry defendant for a fourth interest in the leases held by plaintiffs, as well as a declaration of his willingness to perform what was required of the plaintiffs under their contract.

Mr. Smith's attempt, as a witness, to modify the contract declared upon, by the statement "that we would carry them for that interest just so long as the title remained in our hands," and that "It was agreed that there would be no rentals paid in the event of the failure of the well that defendant, Moore, was to drill", was objected to, and properly so, by defendant, as the purpose of this testimony was to vary, add to, or contradict the terms of the written contract declared upon, there being no allegation of fraud, error or mistake in plaintiffs' pleadings.

Where a written instrument is sued upon, as in this case, the best evidence of the engagements of the parties is the document itself.

Besides, parol evidence, under the laws of this State, is inadmissible to establish title to real estate, or to establish the existence of a mineral lease, a real right.

Plaintiffs had suffered the leases to terminate, and performance of the contract on their part had become impossible.

Under such a situation, plaintiffs are not entitled to a decree of specific performance. Seeger v. Seeger, 169 La. 611, 125 So. 732.

Judgment affirmed.

HIGGINS, J., concurs in decree.

FOURNET and PONDER, JJ., absent.

PONDER, Justice.

A rehearing was granted in this case upon the application of the plaintiffs and it is now submitted for our determination.

From the allegations in the plaintiffs' petition and the admissions in the defendant's answer the defendant acquired leases on 15,000 acres of land known as the "Abbeville Block" in his name for the plaintiffs during the year, 1933. The defendant acquired in his name for the plaintiffs mineral rights in 3,500 acres in this block. All the funds used to acquire the leases and mineral rights were furnished by the plaintiffs. It is admitted that the defendant was to receive a fourth interest in the leases for his services. The plaintiffs allege that the mineral rights were the property of the plaintiffs in its entirety. The defendant admits in his answer that the mineral rights were acquired for the plaintiffs but alleges that he was to receive a one-fourth interest in the minerals under the agreement between him and the plaintiffs. All of the leases were assign-

ed to the plaintiffs by defendant during the year 1933. The defendant in his answer alleges that, at the time the leases were transferred to the plaintiffs, it was understood that the plaintiffs owned all of the leases on the entire 15,000 acres and it was understood that the defendant should have the ownership of the entire mineral interests. On August 3, 1933, an escrow agreement was entered into between the various lessors in the Abbeville Block, on the one side, and Moore, the defendant, and N. R. Tanner, on the other side, wherein it was agreed that the lessors would execute ten-year lease contracts covering their respective tracts of land subject to the escrow agreement. This escrow agreement was entered into while the defendant was securing the leases and prior to the defendant's assignment of the leases to the plaintiffs. It was provided in the escrow agreement that the leases were to be placed in the bank at Abbeville with a copy of this drilling contract which was to be and serve as instructions for the bank in the holding and disposition of the leases; that the leases were to be subject to the condition that lessees were to begin drilling operations within 90 days from the date the leases were placed in the bank and the titles thereto approved; that the lessees were to drill a well 500 ft. deep unless oil or gas was found at a lesser depth; that in event the lessees failed to start the drilling operations at the time set forth, in such event, it was optional for the lessees to pay 50¢ per acre bonus for the leases; that in event the option was exercised the contract would be null and the leases were to remain in force for their primary term; that

such leases shall provide for an annual rental of 50¢ per acre; that if the first well started was junked or abandoned the lessees or their assigns were granted the privilege of drilling a second well within 90 days from the time of the abandonment of the first well; that the escrow bank is instructed and is to be governed thereby as follows: if operations have been started as above provided the bank is instructed to deliver all the leases and contracts covered by this contract to the lessees or their orders. All of the leases were dated November 6, 1933, and are identical in terms. It is provided therein that they remain in force for a term of ten years and as long thereafter as oil or gas is or can be produced on the land. The leases provided if operations were not commenced within one year that they are void unless the lessees shall pay the sum of $———, hereinafter termed rental. The leases were assigned to the plaintiffs on November 25, 1933. Immediately thereafter, during the latter part of November, the plaintiffs began drilling operations and drilled to a depth of 800 ft. which terminated as a dry hole during the month of April, 1934. On June 6, 1934, the plaintiffs assigned to the defendant leases on 7,300 acres of the 15,000 acre block. On that date the defendant wrote the following letter to the plaintiffs:

"June 6, 1934.

"Mr. Claude B. Hamill,
"Mr. R. E. Smith,
"Houston, Texas.
"Gentlemen:

"I hereby agree that when I have finished the well that I am about to drill in the Abbeville Block of approximately 7300

acres, if the well is a producer, I will assign to you three-fourths of all the mineral I now hold in my name; or, if the well is a dry hole, I will assign to you all of the minerals I now hold in my name.

"You have this day assigned to me approximately 7300 acres of the 15,000 acres under lease in your name in this area. It is understood that you will continue to carry me and my associates for a one-fourth interest in the remaining leases in this block.

"Very truly yours,
"(Sgn) J. C. Moore
"Accepted
  "Claude B. Hamill
  "R. E. Smith"

During the month of August, 1934, within 90 days from the abandonment of the first well, the defendant began drilling operations and drilled to a depth of 400 ft. at which time a pipe fell in the hole and stopped the operations. Shortly thereafter a suit was filed against the defendant's drilling contractor and the drilling equipment was seized. Another suit was filed within a short time. After the suits were filed all of the pipe was pulled out of the well and it and all of the equipment moved away from the leased premises. The defendant has made no further effort to operate on the leased premises in any manner. The funds used by the defendant to drill the second well were acquired from a number of people in Abbeville by the defendant assigning to them $^{10}\!\!/\!_{32}$ interest in the leases on the 7,300 acres of land. No rentals were ever paid on any of the leases in the entire 15,000 acre block. On April 8, 1935, the plaintiffs wrote the following letter to the defendant:

"April 8, 1935.
"Mr. J. C. Moore,
"General Delivery,
"Dallas, Texas.
"Dear Sir:

"After talking with you in Dallas it is necessary, as I explained to you there, to show on our Income Tax a record of the money spent in Vermilion Parish in its entirety.

"Am enclosing instruments which I spoke to you about and am asking you to sign them and then return them to this office. We will then have Buddy Tanner sign the one he should sign.

"You mention to your attorney that you have a letter showing our agreement which will protect you under the terms set forth, as that is the status that we have been existing under for some time. Am sure that your attorney will understand the fairness of the request. Under no condition change anything in these instruments. Either sign them or write us a letter, or have your attorney do it, advising us your stand in the matter.

"I do not want to have to come to Dallas, but if my presence there is necessary to final this matter, I now give you my word, please advise your attorney accordingly, that I will come to Dallas and stay there until this matter has been settled.

"I also give you my word that the value of the royalty, in my opinion, is nothing,

but the principle in the matter is all that is involved.

"You mentioned that you wanted the block of leases kept intact for purposes of drilling a well. The changing of the title of the royalty cannot in any way effect this, as I am now telling you that we will do everything that we said we would, just as we have done in the past and will continue to do so, and will do anything to assist you in the carrying out of plans for additional operations in that section.

"Now, J. C., do not misunderstand this statement nor let any bad advice cause you to err in judgment. We rate the consideration that we are asking, so am suggesting that you read this letter personally; that you think carefully before you act in this matter, and then get in touch with us.

"It does not make any difference where you happen to be located, nor when, as this matter must be attended to. Am not even suggesting as to what course you shall take. So advise us as quickly as possible because it is necessary, as our time is limited.

"Since talking to you we have completed our records in regard to the above; also have written Abbeville, and your obligations have been taken care of there, as you mentioned to me; and the royalty is clear.

"Thanking you in advance for your immediate attention.

"Yours truly

"(Sgd) R. E. Smith

"RES:t

"J. C:—Please execute both copies of all three instruments & return all to this office.

"T."

The instant suit seeking specific performance was filed on January 28, 1936, and is based on the agreement set out in the letter of June 6, 1934. Upon trial the district court dismissed the plaintiffs' demand. An appeal was taken to this Court. Upon trial of the appeal the judgment of the district court was affirmed. A rehearing was granted and the case is now submitted for our determination.

It was clearly provided in the escrow agreement that the bank was not to deliver the leases and contracts covered by the escrow agreement until drilling operations began. This clearly shows that the parties contemplated drilling operations to keep the leases operative. It was provided in the escrow agreement that if the parties failed to start the drilling operations, in such event, the leases could be kept operative by the payment of 50¢ per acre bonus. Under the escrow agreement if the parties exercised this option the drilling contract would be null. However, the parties did not avail themselves of the option, but began drilling operations. According to the escrow agreement if the first well was abandoned the parties or their assigns were granted the right to drill a second well within 90 days from the time the first well was abandoned. The first well was drilled within the period set out in the escrow agreement by the plaintiffs and the second well was drilled, after the letter of June, 6, 1934, by the defendant within 90 days or the period of time set out in the escrow agreement. It would appear therefore that all the operations were within the time set out in the escrow agreement and the par-

ties never contemplated the payment of any rentals on the leases. If we were to interpret the letter of June 6, 1934, as is contended for by the defendant's counsel, in the light that the plaintiffs were to continue to carry the defendant and his associates for a one-fourth interest in the remaining leases by the payment of rentals, it would be seemingly strange that no provision was made to keep the leases on the 7,300 acres in effect by the payment of rentals. The manner under which the leases had been kept in effect prior to the letter of June 6, 1934, was not by the payment of rentals but by drilling operations. If the plaintiffs were to continue to carry the defendant and his associates for an interest in the remaining leases it would appear that since the word "continue" is used it would mean the continuation of the manner in which the leases had been previously kept in effect. There having been no rentals paid in the first instance the provision of continuing to carry could not refer to the payment of rentals. It appears in the various transactions between the plaintiffs and the defendant that the letter of June 6, 1934, does not embody the entire agreement but only states the agreement in general. This is borne out by the defendant's answer. The defendant in his answer alleges that at the time he transferred the leases in the 15,-000 acre block in their entirety to the plaintiffs that it was understood that the plaintiffs were to own the leases in their entirety and that he the defendant was to retain the mineral rights and own them in their entirety under their agreement. This refutes the interpretation of the defendant's counsel that the provisions to "continue to carry", etc., was to the effect that the plaintiffs were to "continue to carry" the defendant and his associates the interest in the leases by the payment of rentals. According to the defendant's answer, the defendant had no interest in the remaining leases unless there was some subsequent agreement to the effect that the defendant and his associates were to have a one-fourth interest in the leases which we do not find in the letter of June 6, 1934. The provision of "continue to carry", etc., presupposes that the defendant already owned an interest in the remaining leases. It does not embody the complete and full agreement of the parties herein. Such being the case, parol evidence is admissible to explain that part of the agreement which refers to the continuing to carry the defendant and his associates for a one-fourth interest in the leases. This part of the agreement does not refer to real rights but deals with personal rights because prior to Act No. 205 of 1938, which classified mineral leases as real rights, they were considered personal rights. Gulf Refining Co. v. Glassel, 186 La. 190, 171 So. 846; DeJean v. Whisenhunt, 191 La. 608, 186 So. 43. This being an incomplete contract, the parol evidence is admissible. Davies v. Bierce, 114 La. 663, 38 So. 488; New Orleans & C. R. Co. v. Darmes, 39 La.Ann. 766, 2 So. 230; Board of Trustees v. Campbell, 48 La.Ann. 1543, 1549, 21 So. 184; Walker v. Villavaso, 18 La.Ann. 715, 717; Bass v. Roby Motors Co., 14 La.App. 374, 124 So. 596; Denis, Danziger & Tessier v. Tilton, 120 La. 226, 45 So. 112; Flash, Preston & Co. v. American Glucose Co., 38 La.Ann. 4, 7; Redman v. Murrel, 117 La.[516], 520, 42

So. 49. Moreover, the language used in the agreement with reference to "continue to carry", etc., is ambiguous and does not set out in what manner or for what period of time the plaintiff was to so do. The parol evidence would be admissible not to contradict or destroy the provision in the contract, but to explain it. From the testimony of the plaintiff and three of the defendant's associates, it is clear that there never was any intention on the part of the parties to continue the leases by the payment of the rentals but the whole venture depended on drilling operations to keep the leases in effect. Moreover, the defendant gives as the sole and only reason why he did not transfer the minerals to the plaintiffs was because he had not finished drilling the well and that he intended whenever he could raise the funds to repair the well and drill it deeper. We will quote some of the questions propounded to the defendant and his answers thereto, viz:

Tr. page 162—(Defendant's testimony)

"Q. Upon what ground did you predicate that refusal? A. On the ground that I wasn't entitled to assign for the reason I hadn't finished the well.

Tr. page 167—(Defendant's testimony)

"Q. Boiled down your only reason for not complying with your contract of date June 6th, 1934, with Mr. Claude Hamill and Mr. R. E. Smith by assigning to them the minerals mentioned in that instrument is because you claim you never finished the hole, the well? A. That was the reason, I didn't finish the well.

Tr. page 234—(Defendant's testimony)

"Q. Mr. Moore, I understand you to say that when you met Mr. Smith in Houston that you gave him as a reason for not wishing to sign over these minerals was because you had not finished your well, or in Dallas, and that was or date April 5th or 6th, 1935, is that correct? A. I told him in Dallas I hadn't finished the well and I would have to have the advice of my attorney before I would assign him the minerals.

Tr. page 236—(Defendant's testimony)

"Q. Mr. Moore, I understand that your sole and only reason for not complying with your contract of June 6th, 1934, made the basis of this suit and assigning to them the minerals therein mentioned is predicated solely upon the excuse that you haven't finished the well, is that correct? A. The advice I had I wasn't supposed to turn them over because I hadn't finished the well.

Tr. page 160—(Defendant's testimony)

"Q. What was your position with reference to those minerals prior to the institution of this suit, that is, did you refuse to convey the minerals mentioned in this agreement to Hamill and Smith? A. I haven't finished my contract yet, that is, I haven't completed my hole.

At the time that this suit was instituted the defendant had made no effort to clean out the well or make any further operations thereon for a period of two years. The well was abandoned. The defendant's testimony is very uncertain as to whether he will ever be able to obtain any funds to drill or when he will be able to do so. Under the doctrine laid down in the cases of Louisiana Petroleum Co. v. Broussard,

172 La. 613, 135 So. 1; Prince, et al. v. Standard Oil Co. of Louisiana, 147 La. 283, 84 So. 657, the well has been abandoned.

■ The uncontradicted testimony of Mr. Smith, one of the plaintiffs, was to the effect that the provision in the letter of June 6, 1934, "continue to carry me and my associates for a one-fourth interest in the remaining leases," was put in the letter for the purpose that the defendant and his associates would be carried for that proportionate interest in the leases so long as the title remained in the plaintiffs' hands. He testified to the effect that it was agreed that there would be no rentals paid in event of the failure of the well that the defendant was to drill. This seems to be a reasonable explanation of what was contemplated by the parties.

For the reasons assigned, our former decree herein is set aside and the judgment of the district court is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment in favor of the plaintiffs, Claude B. Hamill and R. E. Smith, and against the defendant, J. C. Moore, decreeing C. B. Hamill and R. E. Smith the owners of the mineral rights described in the plaintiffs' petition; it is further ordered and decreed that the defendant J. C. Moore sign, execute and deliver by authentic act the mineral rights described in the plaintiffs' petition to the plaintiffs and in default of the said J. C. Moore executing the deeds within 30 days after final judgment then, in that event, this judgment shall operate as a full and complete transfer of the mineral rights described herein. All costs to be paid by the defendant. The right of the defendant to apply for rehearing is reserved.

O'NIELL, C. J., dissents.

LAND, J., dissents, and adheres to the original opinion.

ODOM, J., dissents, being of the opinion that the original opinion is correct.